19-7043. And do we want to confirm that Judge Matheson is connected? That's a good idea. Judge Matheson, are you available? I'm still here. Okay, good. Thank you. Your colleagues forgot about you, but fortunately counsel didn't. Thank you. Good morning, may it please court. I'm Neal Van Dalsum. I'm with the Federal Public Defender's Office in Muskogee, Oklahoma, and I represent the appellate Jack Neugin. As I often do when I'm getting ready for oral argument, I try to go over the briefing and the case and figure out what really wasn't talked about as clearly as I would like and what stands out to me from the record as a briefing, a great deal of focus on this question of whether a search happened, whether it actually was a search, when Deputy Clinton opens the back of the camper. And there's good reason that we did that. That was one of the key findings in the district court's ruling, is that opening the truck was a community caretaking function and therefore was not a search. We talked about it in the briefing also, but I would like to focus for a moment on the what causes this concept of community caretaking function. Because if you look at that case law, it simply does not apply to these facts. First of all, none of that case law says that if an officer engages in a community caretaking function, that it's not a search. But is that issue raised in any of those cases? Do they specifically say caretaking function does not satisfy the search requirements? What the case law says is that in a narrow set of facts, that if an officer is engaged in a community caretaking function and completes what would invoke the Fourth Amendment, that the conduct is nevertheless reasonable conduct and doesn't violate the Fourth Amendment. And the two most important cases, I think, on that issue are the Cady case and U.S. v. Lugo. And those cases have both been briefed. In Cady, the United States Supreme Court addressed a situation where a Chicago police officer is found in a wrecked car. The authorities in Wisconsin think that he should have a service weapon with him. The car has already been impounded. And they go out and look in the trunk of the car for what they're really looking for as a service weapon. And on those facts, the United States Supreme Court said, look, these officers are following an established procedure. The car is already impounded. And they really think that there's a dangerous instrumentality present in the vehicle. On that narrow set of facts, we find that this is not an unreasonable act by the officers. Well, there the search could have been justified under an inevitable discovery because of the car having been impounded, I suppose. Except they didn't know under those facts that the officer was suspected of a crime. What happens No, but they didn't. Okay. All right. Let me raise this. This may arise in community caretaking. It wouldn't have been the Cady case that you just mentioned. But there is some language that appears in Supreme Court opinions and one of our opinions that suggests there might not have been a search here, not just because it was community caretaking, but because they weren't looking for something. And there's Justice Scalia's concurring opinion in Jones says, when the government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. Now, in community caretaking, you may be searching for information like a gun in Cady, but that wasn't the situation here. And then in our Ackerman decision, which was written by Judge Gorsuch at the time, it says, Jones explained that government conduct can now constitute a Fourth Amendment search, either when it infringes on a reasonable expectation of privacy or when it involves a physical intrusion, a trespass on a constitutionally protected area. So, I haven't been able to find anything really pursuing that. But there is some authority that if the officers aren't trying to obtain information, it's not a search. Your Honor, what I would respond to that is, is that whether the officer is intending to obtain information under all the Fourth Amendment precedent is evaluated on an objective basis. I come from a background before I started doing these federal criminal cases and found what I want to do with my life. I was an insurance defense attorney. And this sort of reminds me of the situations that would come up where someone would punch someone and say, well, this ought to be covered under my insurance policy, because I didn't intend the harm. And in that context, and it's the same way in this context. Let's look at it objectively. I'm not sure how you measure objectively whether the officer was trying to obtain information. If the test is whether they're doing this to obtain information, that kind of sounds subjective to me. But even if it were objective in this situation, what's there to indicate that the officer was trying to obtain information? What is the to-be-expected result of the officer's conduct? That is the standard. And what this essentially rules, reads out any possible requirement that you're trying to obtain information. Because any time information is found, you'll say, well, that was the expected. That should be the standard if we want to maintain the Fourth Amendment. Let me address this as a separate issue. Here, the opening of the door, let's even say it's a search. That was not at the officer's initiative, was it? Yes. It was? Yes. There was no request by anyone for him to open that door. Well, the woman wanted to get into the car to get stuff. So he's acting as her agent to open that door. No? No. There was no request, there was no need for the officer to open the door for her to get in there. In the testimony, it's clear that there was no request for help with this. They didn't provide help with getting into the other part of the car. There was also no need for an officer to be there to keep a fight from breaking out. The officer's testimony was that they were calm at this point. But he kept them at opposite sides of the car. He got in between them, took control of the space behind the truck, opened it up, and looked down inside. Saw a bucket of ammunition and picked it up and took it out of the car and set it on the ground. That is what happened. There was no request. There was no need. She was not infirm. There was no asking, do you need help? Is it okay for me to open this door? And in fact, the district court found that there was no consent. So counsel, I'm looking at the transcript of the hearing. And at one point, Deputy Clinton was asked, and I'm on page 81 of the record 27 of the transcript. So was this, this sounds like it was at her request for you to assist her in obtaining her belongings. Is that right? Answer, yes. How's that consistent with your answer to Judge Hartz? In other testimony, he makes it clear that he didn't ask for anybody's permission, that he was not concerned with anyone's safety. And there's no testimony about any conversation going on where she is asking him to help. I believe the testimony that you are addressing is in redirect by the government. Yes. After there was testimony already establishing that I just kind of walked over there and opened it up and nobody had asked me to do it. And I didn't ask for permission to do it. Where is that testimony? The pages that I'm talking about are around pages 78 and 74. There's a reference that they were already calm that by the time that they get to the vehicle, that he's not concerned for safety. That's on page 74. But none of that addresses the consent issue. I mean, the request issue. Ultimately, there was no testimony there. There was no statement in the report that is attached to the brief is an exhibit that's in the record. I would encourage the court to look at at the at the exhibits and governments. Exhibit one includes an affidavit from Deputy Clinton. And if you read over the details of what actually happened, there's never any indication that anyone said, I need you to open the door. The officer testified that they all walked out. He got in the middle and opened the door up, looked inside, saw a bucket of bullets, took it out of the car. And then immediately the effort begins. Let's take her over here and interview her in the car and ask her about guns. Another officer during that time period is for the first time running a background check on Mr. Nugent. Let me read from the cross examination. OK. I think all of us have a question here. Says prior to opening the back of the camper shell, did you ask for permission to do so? This is pages 77 to 78. Yes. To get to the vehicle, to get her belongings. Mr. Nugent, I believe, did not have any objections at that time, so she could get her belongings. That's not what I asked you. I asked you, did you ask for permission to open the back of the truck? He says I'd have to reference my report. And then he says there's nothing in his report on that point. Right. Which is not doesn't mean it didn't happen, but it doesn't. It's not in his report. And it's a statement that I can't remember that anybody asked me to open the back. Let me look at my report. Well, it's also not in there. And to the extent that the government is the ones that's arguing consent, the burden is on the government. And the district court made a finding on consent and said, I don't find that there's consent. And then the government expressly didn't object to that in the report and recommendation. And then in their appeal brief indicated they I'm sorry, I want to make sure when you say consent, there are two things. It's not clear whether he's saying, did he get consent from Mr. Nugent? That's one issue. Who would have given consent? And second, what you're referring to just now referred to opening the hatch in the back. Is that right? Correct. Not the front door. Correct. Well, the front doors, Mr. Nugent opened up the driver's side door because the passenger side door wouldn't open from the outside. The government was not involved in that. That happened subsequent to finding the bullets, taking them out of the car and starting a criminal investigation. Didn't Mr. Nugent give Deputy Clinton the keys to the truck door? That I do not recall, your honor. I recall the test. He had the keys and he had the title in his pocket. But I don't believe that any keys that there's any evidence that keys were handed over for purposes of accessing the vehicle. I have a different question. I mean, I'm not quite sure that we're this who opened the door is all that important. It's only important if there would have been a probable cause to arrest when they saw the ammunition. And I didn't see any testimony that they would have arrested him merely for the ammunition. But secondly, the real issue is not that who opened the door, but rather that it wasn't closed again. Because it was the fact the door remained open that enabled him to go back and see the gun. And that really was the triggering event. And regardless of who opened the door, it wasn't closed. And so my question is, was there any testimony about any impropriety of this of the officer that left that door open? I mean, whether he improperly opened it or whether Julie would have opened it. Is there any testimony that she would have shut the door after she opened it? If she would have left the door open anyhow, then he still had the exact same opportunity to come in and see the gun. And that was the real triggering event. So two questions. Was there any testimony about whether the door remained open somehow because the officer opened it in the first place? And secondly, was there any testimony that the officers would in fact have arrested purely on the ammunition? The district court found that the subsequent search of the vehicle was supported by probable cause because they had seen the ammunition and subsequently determined that Mr. Nugent had a felony conviction. When did they learn that? Didn't she say that? They learned that the ammunition was there. I'm sorry, that he had a prior felony conviction. Afterwards. At what point was that? Essentially, two things happen after they remove the bullets from the car. They take Ms. Parrish over and interview her in a squad car about firearms. And another officer then runs a background check on Mr. Nugent to figure out whether he has a prior conviction. And the district court's ruling is at that point there's probable cause that a crime has been committed so that they can search the car. Because we've got talk about a gun, which was prompted by finding the ammunition, and a look into his background, which was also prompted by finding the ammunition. So everything is triggered by seeing the ammo. Correct. You either win or lose based on whether the officer could have seen the ammo. The district court essentially adopted a fruit of the non-poisonous tree analysis. What he said was that there was no search when they opened the car up, looked at a bucket of ammunition, and seized it and took it out. And once they had that, all that they then did was figure out that he was a felon. And at that point you've got probable cause. And everything that happens going forward is permissible. That was the analysis of the district court. Your time has expired. Judge Matheson, did you have any questions? I just had one more question. It's a slightly different variation on what we've been talking about. But how could Mr. Nugent have had a reasonable expectation of privacy when he knew that Ms. Parrish was going to take her things from the back of the truck in the presence of the officers? There's a reasonable expectation of privacy in the closed compartments of the vehicles. The ammunition, was that in a closed compartment? The ammunition, according to the testimony, is in a bucket that is very close to the tailgate of the vehicle. And this is a hatch that opens and the tailgate remains up. And Deputy Clinton was careful to testify that he didn't break the plane of the goal line, so to speak, by poking his head over into the vehicle. That was his testimony. But he did say, I looked down into the bucket. And it was the positioning of his body in the process of opening the vehicle that gave him the vantage point. On the gun, which is a little bit of a separate issue, on the gun there's a lot of talk that this gun's in plain view. But it's not in plain view for, am I done? I think you're going to be unanswering the question. I think I have, honestly. All right, thank you. Thank you. May it please the court, my name is Linda Epperle. I represent the government of the United States. Quickly, in reference to the court's question regarding whether or not a community caregiving function is recognized as an exception to the exclusionary rule or exception to the search requirement. Recently, in 2015, in this court's case of United States versus Gilmore, rising out of the stock show here in Denver, this court found that normally searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few established and delineated exceptions. And this court found one such exception is for the community caregiving functions, which are police actions totally divorced from detection, investigation, or acquisition of evidence relating to a violation of a criminal statute. And I believe that there are several other cases that talk about the community caregiving function being an exception to the normal Fourth Amendment analysis. And that's because, as the Supreme Court stated in Elkins versus United States, the courts have seldom shown themselves unaware of the practical demands of effective criminal law enforcement. One of the practical demands on law enforcement is not only investigating crimes, but it's dealing with people who are passed out at the stock show, or wandering around in a field for several hours and then found slumped over. Or in a car that has been wrecked. Or in this case, a car that is disabled, with a couple who are arguing. But weren't the officers responding to a reported domestic altercation? How does that take us into community caretaking? They were responding to a domestic situation. The woman had called, been allowed into the office there and had called for help. The parties had agreed that they would separate for the night. Their car wasn't going anywhere because it was disabled. And the officers were attempting to simply keep these parties separated from one another until she could retrieve her property out of the vehicle. Both parties understood this. There was no objection as they stood at the back of that trunk with the officer in between the two parties. The hatchback was going to be opened by someone. The officer maybe didn't have to be the person who opened the hatchback, but I would suggest a couple of things. One, we like to believe our officers in eastern Oklahoma are well-trained and courteous people. And as ancient as it may seem, it is viewed as polite. But are you arguing that politeness is the test for community function? No, but I'm arguing that it's one of the things the court could consider. Maybe that's kind of like what I was asking about earlier, that he was acting as her agent rather than taking the initiative. That's being polite. Okay, you don't have to open it. I'll open it for you. Go ahead. He was acting as both their agents because they both knew that they needed to separate. Somehow that truck was going to get opened. If she had opened it rather than him, then it's not clear that he would have seen that bucket. Because when she opened it, she might have been standing between him and the bucket. And blocked his view. She might have shut the door after she had gotten her clothes out. We don't know any of those things, but had those things happened, then he might not have ever seen that bucket. First of all, the proof, yes, if all that were true, perhaps. But in this case, the testimony was that all three of them were lined up there at the back of that pickup. Once that truck lid came up, the officer did not have to lean over or stick his head in in order to see that bucket of bullets. No, but if she had been the opening agent, she would have been potentially between his view and the, I presume he wouldn't have been hovering immediately behind her or immediately to her side if she were the one opening the car. We don't know that, but it's the government's burden on this. The officer likely would have been standing still in close proximity to the back of the truck for a couple of reasons. One, to stay between these two parties. And secondly, the defendant had in fact asked the officer to make sure that when she went into the back of that truck, she did not get out any of the jewelry that supposedly belonged to one of his family members. So the officer would have stayed where the officer could monitor both of the individuals and monitor what was going on. Just to be clear on that last point, did Mr. Nugent ask the officer to make sure that she didn't take the jewelry or did he ask her not to take the jewelry? I do not have the citation to the record in front of me to be able to tell you exactly who that was asked of. My assumption would be that it was asked of the officer because those two people were attempting to not talk with each other at that point. And I think it would also be consistent with a little bit later in the testimony where the defendant did give the key to the passenger portion of the compartment to the officer so the officer could attempt to open the door. And the court had some question about that. The defendant gave him the keys to attempt to open that door. Counsel, can I maybe just break down? It seems like we're touching on different bases for the search. We've talked about community caretaking. I think we've been talking about maybe inevitable discovery in terms of he would have seen the ammunition if she had opened the back. One of the things that I think you're touching on now and I'd like you to address further is whether it's your position that Detective Clinton had consent to open the camper shell lid on the truck. We have not addressed consent for one reason, Your Honor, and that is that the magistrate judge went to great detail in providing several ways in which this search could be conducted. And the court has said that consent could be upheld, including community caretaking, plain view, probable cause, inevitable discovery. I understand that there was reliance on community caretaking, but if we don't agree with that, is consent a backup position? Consent in the view of the government factually could be a backup position. However, given the number of other alternatives, it would seem that that would be perhaps a more problematic way to go. Consent is not actually before the court. We did not appeal the magistrate judge's finding that consent was not sufficient. Okay, then let me rephrase. If we disagree with you on community caretaking, do we need to reverse? No, Your Honor. Why not? Because our position would be there were four different bases given by the magistrate court as a way to justify the seizure of the shot of the rifle and the ammunition. In order for the defendant to prevail, the defendant would need to prevail on each and every one of these possibilities. But you didn't argue that in your brief here. Yes, Your Honor. You argued all the alternatives. I believe we did. You did argue consent, though, did you? No, we specifically did not argue consent. So if the court decided to go down the path of consent, it would not be because we brought the issue before the court. It would have to be this court searching for some alternative grounds to affirm it. And that certainly would not be the cleanest route to do so. But we did. We argued in our brief, I may have misunderstood your question. We argued in our brief, I think at the beginning of our summary, that the defendant would need to prevail on community caretaking, plain view, probable cause, etc. And we also indicated in our brief that we did not appeal the magistrate's decision on the issue of consent. Could I just ask the question a different way? And that is, does the case hinge on whether the detective violated the Fourth Amendment when he opened the truck's camper shell? No, Your Honor. Because there were other alternative views. One of which was plain view, the ammunition. It didn't matter who opened the back of that trailer, could be seen without the agent having to penetrate the boundary of the vehicle. After the ammunition was removed, then the parties went into the interior of the car and through the open door, the officer was able to see the stock of the rifle. Was that from the door or from the hatchback that he could see the stock? I believe he could. My recollection is he could see it from both. And I know that when they were trying to get into the door is when she told him he's got a gun in here and he tried to shoot me with it last night. I thought he saw the gun. These photographs purportedly shows the stock of the gun. Were those taken from the front seat or were they taken from the hatchback? That I cannot tell you. And I'm not sure. I am not sure. But no matter which place, it certainly could be seen. And while the defendants would like to argue it just looked like a piece of wood, I think the photographs, if you view them on a computer, will be able to show that there was a piece of wood that was highly polished. For anybody that's got any familiarity with rifles, it looked like the stock of a rifle. And that's what the officer testified. Yes. And yes, precisely. So therefore our argument would be that no matter which one of them turned the lever on the back of this hatch, whether it had been the officer, whether it had been the defendant or the woman, the hatch was going to be opened. Once it was opened, the ammunition was going to be seen. The question is not whether the hatch was going to be opened, at least for the gun, but rather whether it would have been closed again. And that's my question. I mean, if she had opened it and said, I've got my stuff out now, I'm closing it again, then assuming he saw the gun from the hatch, which is what I've always believed when I saw the pictures, but there's just no testimony about what she would have done because she didn't do it. True. However, this is not a case like the other cases that have come before this Court where a door or a panel was left open. And I think most of those were drug sniff cases where there was the allegation that the officer left it open in order for a scent to be more accessible to the dog who was eventually coming by or left it open so that the drug dog might actually jump in through an open window. There certainly was not any of that in this case. There was no drug dog involved, obviously, but there's no indication that it was left open with the intent that it would somehow enhance their ability to do an investigation. I want to go to that intent briefly because your brief kept talking about, well, there was no intent to search it originally, just stumbled into it. But I really don't think that intent matters, even though it was a big part of your briefing. Fourth Amendment, we just look at the objective test. We don't look at the subjective test. So Wren said you don't use it for the Fourth Amendment. The Supreme Court has recently said you only look at the objective intent. I just don't see how we can get into what the officer's intent was. That's the very kind of psychoanalyst that you've been told to astute. It is difficult from an analytical and logical... Or legal. Yes, to reconcile. So I think that your brief was a little bit unhelpful to us, leading us down a factor that we shouldn't really be considering and can't consider. Well, it's difficult because on the one hand you do have the cases that talk about, for Fourth Amendment analysis, you look at an objective test, not a subjective one. However, we also have, in setting up this community caregiving discussion, in all of these cases from the Supreme Court on down, that in community caretaking situations, the officer's goal is not to investigate, similar to the language that Judge Hart's read earlier. But even if we accept a community's function, you have got no cases that say that that satisfies or excuses an officer's unauthorized search. So I don't think it really much matters whether we say this is community function or not, because it doesn't excuse an improper search. We're still back to the basic question, was this an improper search or not? And we do that objectively, not subjectively. So it seems to me a lot of your brief was leading us down rabbit holes. Well, I apologize if that's the case. Can I finish my answer to your question? Because I have a question. My answer would be that, going back to what you mentioned earlier, the community caregiving is an exception to the Fourth Amendment. So perhaps we never get to that discussion of the objective, subjective standard. With respect to the inevitable discovery argument based on the fact that the car would have been inventoried, the defendant argues that the only reason they were going to impound the vehicle and tow it was because they were arresting Mr. Nugent. And the reply brief says there was no testimony that the vehicle would have been towed and inventoried merely because it would not run, merely because it was inoperable. Is that correct? Is there any evidence that when you have an inoperable vehicle on private property that the police will tow it? Maybe it was even in public. I do not believe there is evidence. There is my suspicion that they wouldn't have let it sit there. Thank you. Counsel, your time has expired. Thank you for your argument. The case is submitted and counsel are excused.